to double. Mhm mm. Thank you. Yeah. Good morning, Your honor. My name is Anne Fitz. I'm from the state of Hilleth Defender's Office. I thank you. May it please the court. After a jury trial, Mr Sorenson was found guilty of armed robbery of a CVS pharmacy in Crystal Lake. He was sentenced to 25 years, and this is a direct appeal from that conviction. Every defendant has a fundamental right to confront his accusers. But here the trial judge limited that right by limiting the cross examination of the state's key witness, Mr Sorenson's ex girlfriend, Aaron Dorsey. You say it's the state's key witness. But aside from her testimony, uh, wasn't the physical evidence that was collected pretty overwhelming? I would call it overwhelming. I think that there was physical evidence. The car was with the magnetic plate, the jacket, which was identified as being looking just like and it was a unique plaid jacket. Um, John, the father's phone call. I mean, the evidence is pretty compelling. I don't think it was irrefutable, though. The car, for example. Well, how would how would the cross examination have made a difference? I believe that it could just let the jury decide whether Miss Dorsey was credible. But the jury already knew that she didn't want to be there. I don't know that they were able to testify that she was concerned about her job, etcetera. Yes, yes. But I believe that it's important to allow the jury to understand the circumstances, circumstances under which he made that first identification. And I believe that the evidence, while there was some evidence, it was not irrefutable. And, for example, the car, it was first identified as potentially being a Mazda. The picture was taken of the car, Mr Sorenson's driveway and then shown to the witnesses. But the witnesses were shown only that car and no other car to compare it to. And in determining whether or not the defense right to confront was violated, we look at what the defense attorney was allowed to get into evidence, not necessarily only what's excluded, correct? It's it's a balance. And here the defense brought out that she made a prior inconsistent statement, had called the police and said it's not. So where's the harm? I believe the harm is in the fact that we don't know why she was inconsistent because she was inconsistent three days after she made that first identification. And then at trial, she said it was him again. I think it was important for the jury to understand what her thinking may have been, what her motivation may have been. If she had any bias, why she was making those statements. Why don't we hold in those points that you raised? Because I mean, I think we'd all have to concede that why that attitude is supposed to be a Florida defendant in the criminal case on cross. But as I understand it, what you're raising in your briefs are two specific parts. One is that the judge sustained an objection when defense counsel asked if she'd been under subpoena and whether or not she had any Children. So why is, first of all, somebody being under subpoena? Why would that give rise to an inference? The person might be testifying falsely. What's the connection between subpoena and that inference? I think standing alone, it may not. But within the context here, it certainly contributes to the motivation that she may have had. I think that the jury could have been allowed to hear that, and they could have been cross examined or, um, rebuttal witnesses could have even. So in every case, it's all right to bring up whether or not you've been subpoenaed. That's relevant in every case. I don't think that it's irrelevant. I think that the jury could hear that and they can make their own decision as to whether it was appropriate for them. Then you've got the question about whether or not she had Children. That's right. Isn't that a little tenuous or speculative as to how that ties into a motive? I mean, in and of itself, does that give rise to an inference? I think in and of itself, it does give rise to the relevance of the question because the police had pictures. They had no pictures like they had. They should not have had pictures of her Children, and that in and of itself is enough to warrant further inquiry. Well, was there an offer of proof made? I mean, what was the sensible time she had Children? Is there some evidence that the police actually make some kind of threats that she might lose her Children if she doesn't cooperate with them? What exactly are you saying? During the offer of proof, defense counsel said that the police showed her pictures of her Children at that first identification. She then told the best counsel that she was afraid they would be taken away from her. And the fact that there's that connection strongly suggests that there may be may have been some sort of threat, some sort of, um, you know, suggestion that her kids would be taken away from her. Would that even be realistic? I mean, that's such a far fetched. Even if a police officer said that she's an educated woman, she's a school teacher. The most educated people would say that's belonging. You can't take my Children away. I mean, that's that's such a stretch. I think that you really believe that the adults would have established that that is so bias and paper of the state. I believe it may have. And I believe that it was for the jury to decide whether that caused the bias. I believe that she was scared. She was under stressful circumstances. She was surprised by these police that came to interview her. She was in her boss's office for three hours. I think that those circumstances certainly could be stressful enough to induce someone to go along with maybe a suggestion by the Were those officers asked on cross examination any questions about their interview of Miss Dorsey? I do not believe they were. And they weren't asked whether or not they had shown her photographs of her Children. Were they? No. So absent that evidence, all you would have is they showed me photographs of her Children without any corroboration. Correct. They showed her. They showed her photographs of her Children. And then she told defense counsel she was afraid they'd be taken away. And then she also later testified that she did. She feared for her job. She was now kind of cast in a negative light because of this. I think that but she never told defense counsel what I said or what I said in that first interview was not truthful. She didn't say that. Did she? The offer of proof does not say that. I don't know if there may have been other conversations, but according to the record, the offer of proof could have been more detailed. But from what we know here, there's enough evidence to show that she should have at least been allowed to explain those circumstances. But the trial court is left with just the opposite proof made by the attorney. Correct. I mean, in the first offer of proof, the trial attorney basically just said, Judge, this goes to her state of mind. And if I'm the trial judge, I'm sitting there. I say, What does this witness the state of mind have to do with anything in this case? Well, again, I believe that her state of mind was because because of her inconsistent testimony. Why did she have that revelation three days later that it wasn't him? And then at trial, she's saying that it was him. I believe that. And again, because of the reason that her kids were brought up into this, and they had no reason to be. I believe that that at least should have allowed further inquiry because the jury would have been able to determine on its own whether she felt stressed out to identify him or her motivation to shouldn't offer proof of going a little further than to say this to delay this out for the judge, as opposed to saying it goes to her state and she felt pressured to testify and she was worried her kids would be taken away from her. The issue is whether we're speculating now as to what happened between the police officer and her and how that affected her. You know, are we able to speculate as to that? I understand where the speculation question comes in. As far as the offer of proof, it could have been more detailed, and it was not regarding regarding her reasons for calling the office for saying it. Now, I don't think it was him. She explained that the reason she did that is because the defendant called her, denied that it was him. And then she said, I think, quote unquote, I wanted to give him the benefit of the doubt, and that's why she called the officer. So that explanation was there, wasn't it? She did say that, but I don't think that the defendant called her. From what I understand, she the record says she simply talked to the defendant and his they spoke. And when she made that when she recanted her identification, she was at her house. She would. She did not have police hovering over her. She could thoughtfully evaluate those pictures that she was shown. So I think even though she said that she wanted to give him the benefit of the doubt, I don't believe that that in and of itself explains adequately enough for the jury to understand. If we were to conclude that the defendants of Constitutional right of confrontation was violated by the restrictions on cost, wouldn't this case also be subject of a harmless error analysis? I believe that the error is yes, I believe that it would be subject to a harmless error analysis. And the strength of the evidence would be relevant. The strength of the state's case would be relevant. Correct. But I also believe that this evidence that they had and was not irrefutable. It was general. The CBS employees, none of them identified Mr Sorenson as a person seen in the CBS video, even the person who spoke face to face with him. And they were never asked on trial whether Mr Sorenson was the man that they saw that night. And in fact, the pharmacist said the person he spoke with was not too tall, not too that that was what the state may have been looking for for a stronger. What about the weapon? Wasn't this weapon ostensibly the father's weapon? The father's gun. I don't know if it had been determined unequivocally whether it was the father's. Well, he indicated coincidentally at the time his weapon was missing, right? Correct. And a weapon was found in the possession of Mr Marmot. Yes, he's a friend of the defendants. Yes. How do you explain that situation? Sure. The fact that there was a weapon does not necessarily relate to the fact that the identifier, the one person who said that he was the one in those pictures, does not relate to the fact that she may have been persuaded or scared to identify him. I'm sorry we're talking about. I okay. So wouldn't that be corroboration? In fact, the father reports a weapon missing shortly after a robbery is committed. Um, and then a weapon ends up in the possession of a close friend of the defendant that those facts are true, but that it was never shown on trial that that gun was used in an armed robbery at CBS. There were plenty of, for example, there was no fingerprints found anywhere on anything. Even the bottles that were there were prints, but none. Yes. Yes, sir. We don't have any idea who those other prints were. There were other employees, other customers, whatever. Mr Sorenson provided, I think, at least two different samples of prints, and they were not able to recover any of them. The additional evidence, for example, the jacket that you mentioned, it was never tested for any evidence. It just was there. So I don't know. I know I saw that he ever wore it, so I don't know that that necessarily becomes irrefutable. The state could have done a better job, for example, that DNA touched DNA on the jacket, touched DNA on the band aid, which theoretically was the band aid seen in the video covering the tattoo. Right. I couldn't myself see it very well, but yeah, that was the testimony. So, right. Uh, let me ask you this. The robber in this case apparently had asked for some painkillers. Correct. Demand some painkillers. It turned out that the defendant also had obtained some prescriptions for painkillers. Yes. Those same type of medication. Yes. That's a common drug. From what I understand. I know that I don't have actual expertise, but I don't think that that's necessarily out of the ordinary. I think that just because he takes the same kind of medicine as this other person takes, he had the ability to obtain it legally and to get prescriptions for it while he was also providing it to Ms Dorsey. He gave her one pill from what we understand, but it could have been from his own prescription that he was given. Yeah. It's unfortunate that it was the same, but I believe that it does not again necessarily show that Mr Sorenson was the person there that night. The state in support of your argument, the state did argue that the defense had not introduced any or they suggested there was no reason for her in closing argument. They argued in the stores. No reason for her lying. The fact that they argued that we don't know if there was a reason for her to lie. You weren't allowed. The defense was not allowed to establish. There may be that reason because she feared exactly. And that was up to the jury to decide. I believe that the prosecutor said she's telling the truth. She has no reason to lie. And just capitalizes on that limitation of the questioning from the defense to Aaron Dorsey. Had the jury been able to hear that they would have been able to determine on their own without the prosecutor telling them whether she was truthful or not. I believe that Dorsey's role is crucial in this and whether her credibility was whether she was credible or not was again crucial. The seat depended on and as you said, they referenced it in their closing. Additionally, the stressful circumstances under which she first made that identification, I think also contributed to the questionable her questionable credibility. She was, they surprised her at school. They pulled her out of class. She sat in her boss's office for three hours and they asked her where you cards are robbery. And I think for, you know, I think a lot of would consider that that to be stressful. Mr. Thank you. Time is up. If there are other questions, we ask that the court reverse and remand this case. Thank you. Swiss. Good morning. Your honor's counsel. This all comes down to this is an abuse of discretion standard. Let me get to what Justice Burkett asked about. Um, did the prosecution in this case use this ruling as a sword and not a shield? Well, properly so. I mean, it isn't, it was not direct, uh, certain evidence of any sort of intent or bias on the part of Miss Dorsey. And the reason is that the defense is really making a leap here, making it remote and uncertain in terms of her wanting to falsify for some reason. All we know is that she was stressed by this by being involved in this, you know, criminal investigation. That's understandable. Her and that much was brought out to the jurors in terms of her job. She said she feared for it. In fact, something adverse to her had occurred between her and the principal at her school. So she is stressed. And that seems to be what in terms of the offer that was made here, the proffer by defense counsel in terms of where these questions were going in terms of the subpoena, it was just state of mind. And that certainly doesn't indicate anything in terms of her willingness or her desire, her bias, her desire to false falsely implicate this defendant in terms of the photos. You know, there was the defense attorney went a little further and said, Well, she would also say that she was worried about losing her Children. Well, certainly that may be true. She was obviously faced with Oh, my goodness, this is about to become public. I'm married. I have a boyfriend now who they're investigating for a criminal action. Um, you know, so that gets off into the room. I think I'm a little bit of speculation. It's tenuous because many people testify young Children, minors. I don't know in and of itself that's going anywhere, but it is a little perplexing to me. Did the police show her picture? Well, okay. Um, and why would they do that? Well, I don't. I certainly don't think when we're looking at it from this point of view without an offer proof that goes further, we have to presume. Remember that console below is presumed competent. So we're not thinking the conduct of the officers getting the would you agree that getting an identification? Of course. And that was part of their procedure to get the identification. They showed this woman photographs of her Children, and there was an offer of proof that they did that. Why? Why would the judge not allow the attorney to explore that on cross examination as as as to why did she make that identification? Because the only thing that was offered in terms of that is that she believed that she might lose her Children. Not that there was some type of threatening that they showed her photographs of her Children. And as a result of that, she was afraid she was going to lose her Children. I mean, the facts actually not even said isn't within Mr. McArdle say in a sidebar that she said she told me she was afraid she was gonna lose her Children. Yes, but I didn't say that as a result of an implicit threat, not not an explicit threat for a quote unquote state of mind. Her condition. What was she thinking at the time? Well, in terms of being nervous, there's where the leap is in terms of being nervous or worried about things coming out or that things are or that she's gonna be associated with this defendant or that she's gonna have to testify against him and she likes him. You know, any of those worries are concerns, but they don't go to saying, well, that she's going to make it right now would have been a fine argument in closing argument for the state to explain why it made no difference. But the defense should be allowed to establish the circumstances of the identification. Correct. Would you agree? Yes, but there was no motion to suppress the identification and that doesn't. This is a trial where the jury is entitled to know how is this identification made? What were the circumstances? But they were told that they were told in terms of the three hours that it was at her, that she was, uh, you know, given what she was given that she made these statements. They were told that they knew that it was at her school. They knew that she later she explains how she doesn't want to be here. She doesn't want to be. But the jury officer showed her pictures of her Children. No, they did not know that. But again, everybody, you know, a lot of witnesses have Children. They're under subpoena. Are you saying that the police always when the interview witness produced pictures of his Children standard procedure? I'm not saying that. But you're honest. I would have to say there's certainly a benign explanation for that. That has nothing to do with this. And I think it would be incumbent upon defense counsel to show that, in fact, there was an implied threat of some sort. You know, in other words, here are your Children. You know, we need to explain after the fact, but shouldn't the trial effect be aware of it as it goes to the witnesses interest by bias motive to testify. But there's where it breaks down your honor on this offer that was made. It's offer proof of a very informal one by defense counsel. There was no indication that, in fact, there was any implication from those photos. I mean, those don't have to be long. I think it's gonna be a result of police misconduct for an identification. Be questionable. Well, if the identification is questionable, then again, that has to be in a motion to suppress that's litigated and determined in terms of whether or not that identification is even a reliable one. Given the circumstances, the case law clearly establishes that even if you lose a motion to suppress, you're still entitled to present that evidence to a jury to let the jury determine the weight of the evidence to be given to the identification. Correct? Correct. But correct in terms of evidence which would go towards her motive to falsely identify him. Let's talk to another issue that I think support. Oh, well, I just wanted to say that, you know, it's hard to understand how police officers would have photos of her Children, and we don't know whether they were photos of her with her Children. But there is an indication on the record, and it certainly explains it in a benign way that I think it was. Detective Houlihan said he was on Facebook looking defendant up on that. That's where you would normally find those types of photos. I would think linking her. He's already told the police on September 18th, well before her interview that this is his girlfriend. He went to see in KC and, you know, they've seen a picture of her. They can probably through Facebook come up with this information. But it may just be look, you know, you're seeing that person. You have Children. You know, we want you to talk to us. Will you talk to us? You know, you're the girlfriend. But this is, you know, that's gonna be hard for you. But, you know, we're here to ask you questions, and we're hoping you keep in mind who you really are in order to answer them. That's not really true that the restrictions placed by the judge, the objections that were sustained obviously violated the defendant's right of confrontation. Is this a harmless error case? Of course, it's a harmless. And so why is it okay to go through the evidence? Defendant left town the day after robbery. So I mean, most of what Aaron Dorsey provided is that she was with him immediately after the robbery. In other words, he did leave town, but he says that himself, too. He told the detectives that, you know, and his parents told him a few days afterwards he's gone. He's with his girlfriend. He tells them way before they interview her that he left town with her, you know, the next day in terms of the oxyconin that he gives them. So he has oxyconin. We know he has oxyconin because the search warrant and everything else and the police on September 18th. Well, before the interview says I am on oxycodone 30 milligram, you know, instant release the exact same drug. So we already know that even without her testimony that ties into it in terms of the identification, probably the most important thing that you could say that she offers. She can look at him on the phone and say that looks like him to me. But first of all, what we have is the jurors seem to vote on him on the robbery. They can also make that connection. And your honors will see that it looks just like him. Yes, his eyes are covered. Yes, he has a hat, but it doesn't like him. And in fact, what's most important, I think, is that the defendant calls and when he's caught in saying that his parents told them they were there to investigate a CBS robbery, they say, Well, we did talk to your parents, but we didn't mention the robbery. He's caught. So he it's to his detriment. He says, I have a friend that actually called me, told me that there's a picture that, you know, looks just like me, basically, like look familiar, laugh out loud in his text. So when he says, Yes, it does look like me, he looks at the picture. It looks like me. But there are a lot of people who look like me. That's his. That's his identification. So we have a friend of his saying it looks like him, which is much like Aaron Dorsey saying it looks like him. Plus, on top of all that, we have the jacket is quite distinctive. It's a grayish jacket with a yellow stripe. This is not a hoodie that's maybe blue or black, like everybody wears. You know, a million people walking by. This is something that stands out. Even in the video, you can see the yellow stripe. The pharmacist says there's a striped jacket that he was wearing. Oh, that jacket that seems to be the jacket that he was wearing. That's the jacket found underneath the stairwell in defendant's residence in the basement of his parents home. His is important or maybe more is the car. Yes, one of the two witnesses who saw him leave the store and get into the car said, Here's a symbol. And that symbol did not match the Toyota that he was driving. But they both said it's a silver sedan sports car. One said it's spoiled on the back. The other one didn't mention that, but didn't say anything differently. That's what he's found to be driving. That is what he's driving when they do a surveillance of that's his car. That's the picture that we find you're endorsing on in this car. Um, they say the odd thing is no license plate on the back. That's what we really noticed because they saw from the rear and kind of side view. Well, this car and when the cops approach the police approach, they look to see the license plate, touch it. It basically falls off. It's held on by magnets. And in a court, I think it was Miss Schluter of the C. F. C. V. S. Pharmacy. She testifies about the car. She's one of the eyewitnesses to the car. She says, Well, you know, yeah, they only showed one photo of the car, and it seemed to be the car that Stephanie's car, and it seemed to be the car that was used here. But, you know, as far as other photos or other cars, what I really noticed were those markings, which were where the magnets were. That's where what I really noticed is that that's why I knew there was license plate kind of drew my attention to the license plate being missing. So I mean, with that identification and all those details and then the gun, the gun is with a friend of his. The gun is stolen mysteriously, not no break into the home of the defendant's father. Yet his gun is taken. It's a clock. It looks like the gun, according to the pharmacist, found his friend. And when he calls and they have a talk over the phone in the jail in September, defendant and his father, his father accuses him of having taken it. And he says, Well, I know where it is, and I can get it back. When you put all that evidence together, it is absolutely overwhelming evidence, and it does not matter than if, in fact, that this court were to find error. But we believe there is no error here. It is the defendant's burden to make a record which shows that error occurred. And without going further in terms of, you know what, enough for proof that there could have been more. There wasn't. We only have what we have on the record. And for those reasons, we would ask your court to affirm the defendant's conviction. Thank you. That's right. Yeah. Counsel argued that there was no direct proof. There does not need to be direct proof. There needs to be evidence that gives rise to the inference that there may be a credibility issue. Also, she said that there was of an explanation for the kids pictures. There's not. There's no reason that the police should have pictures of a witness's child witness's child and show them to her when she's already under stressful circumstances. The only reason is to scare her for some for some outcome that they may have hoped for. And while that is not directly stated, I don't think that there is any other inference that could be made from that. Additionally, counsel argues that it's not harmless error. I'd like to point out that again, the pharmacist and the CBS employees could not identify Mr Sorenson. They didn't say he was the man that was there that night. The pharmacist could identify a god, a jacket, but not the very face that he was standing right next to. Also, he was never asked to identify Mr Sorenson's voice, and they had conversations. I think that says strongly suggests that there was questions about his identity was not brought on a cross examination, though, that there were attempts. The defense didn't cross examine pharmacist his inability to identify, which is would be admissible. Correct. The defense did not cross examine on the inability. Just left with what the record show. Again, as far as harmless error, Aaron Dorsey is not an expert witness, and council referred to a friend who had emailed a picture to Mr Sorenson, saying it resembled you. That friend is not an expert, and what he said can't be relied on. Could the jury look at this picture and make its own decision? You got the defendant sit right there at table picture. The jury could look at it and make their own determination, but it wasn't the night that the robbery occurred. We don't know that he's changed that much. I don't think that if the pharmacist couldn't recognize him and, you know, Aaron Dorsey said it's him. It's not him. It's him. I don't know if the jury's identification of that person a year and a half, two years ago is the same person sitting there. I don't think that that is. That's not a logical conclusion. Please, if there are no other questions, yes, that the court reversed in this case. Thank you. We thank the attorneys for their arguments today. We'll take the case under advisement.